W. H. Wilson v. Commissioner.
Wilson v. Comm'r
Docket No. 3027.
United States Tax Court
1946 Tax Ct. Memo LEXIS 139; 5 T.C.M. (CCH) 592; T.C.M. (RIA) 46166; July 17, 1946
*139 Held, that in the taxable years petitioner's wife, who had contributed her own capital, was a bona fide partner in a cotton brokerage and merchandising business with petitioner and others, but that petitioner's minor daughter, who contributed neither services nor capital originating with her, was not a bona fide partner. J. A. Neely, Jr., Esq., Anderson, S. C., for the petitioner. B. D. Hathcock, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: This proceeding involves income tax deficiencies for the calendar years 1940 and 1941, in the respective amounts of $6,820.48 and $42,042. The following issues are presented: (1) Whether petitioner is taxable on shares of partnership income reported by his wife and his daughter in each of the years; (2) the amount of depreciation *140 allowable in 1940 on certain rental property located in Georgia; (3) whether petitioner is entitled to a loss deduction in 1941 on account of the demolition of a building at Bainbridge, Georgia; (4) whether petitioner is entitled to a loss deduction in 1941 on account of the sale of certain real property at College Park, Georgia; (5) whether petitioner is entitled to deduct as a loss in 1941 certain amounts paid by him in settlement of accounts payable to two brokerage concerns; (6) the amount of depreciation allowable in 1941 on certain buildings and equipment used in petitioner's poultry business; (7) whether petitioner is entitled to any depreciation allowance in 1941 on an automobile kept partly for personal and partly for business use; (8) the amount of earned income credit to which petitioner is entitled for each of the years; (9) whether the partnership is entitled to a depreciation allowance on an office building in the amount of $65.53 in each of the years. Issue 1 Findings of Fact Petitioner is an individual, a resident of Greenville, South Carolina. His income tax returns for the years involved were filed with the collector for the district of South Carolina. During *141 the taxable years petitioner was a member of a partnership, W. H. Wilson Co. (sometimes referred to as W. H. Wilson & Co.), which was engaged in the cotton brokerage business, in the merchandising of cotton on its own account, and also in transactions on the market in cotton and stocks. It also furnished the personnel for the operation of a warehouse company, from which it received monthly compensation. It operated on the basis of a fiscal year ending June 30. From 1928 until June 30, 1935, a corporation known as W. H. Wilson, Inc., was engaged in a cotton brokerage business in Greenville. When the corporation was organized, 186 shares of stock was issued, 10 in the name of petitioner and 176 in the name of petitioner's wife, Mrs. Clarice T. Wilson. Mrs. Wilson paid in $5,000 cash and gave her note for the balance, which she paid off in 1930 by mortgaging her house for $7,500. W. H. Wilson, Inc., handled cotton in Greenville for Crespi & Co., cotton merchants of Dallas, Texas. In 1934, petitioner negotiated with Crespi & Co. in connection with the construction and operation of a warehouse to facilitate handling Crespi's cotton. Petitioner and Mrs. Wilson then formed the partnership *142 W. H. Wilson Co. for the purpose of acquiring stock in the contemplated warehouse company and of constructing and operating the warehouse. Crespi & Co. agreed to advance the money for the construction, and petitioner gave Crespi a note for $8,500, signed "W. H. Wilson Company, by W. H. Wilson." Thereupon a corporation known as the Wilson Bonded Warehouse Co., Inc., (hereinafter referred to as the "Warehouse Company") was organized under the laws of South Carolina to engage in the business of storing and handling cotton. Altogether about $18,500 was paid in for stock. The stock certificate book of the Warehouse Company shows that on September 29, 1934, 85 shares of stock were issued in two certificates, one for 45 shares and one for 40 shares, in the name of W. H. Wilson Co., and 90 shares were issued in the name of Gulf Warehouse Co. of Galveston, Texas, a corporation operated by Crespi. The 85 shares were put up as collateral for the payment of the partnership note to Crespi & Co. The note was subsequently paid off in part by deductions from commissions due from Crespi & Co. to W. H. Wilson Co. and in part from dividends on the Warehouse Company stock. Thereafter, on June 30, 1941, the *143 85 shares of Warehouse Company stock were recorded on the books of W. H. Wilson Co. At the close of its fiscal year on June 30, 1935, the corporation, W. H. Wilson, Inc., was dissolved and liquidated. The partnership, W. H. Wilson Co., took over the assets of the corporation, including a small office building, and assumed the corporate liabilities. The partnership continued the cotton brokerage business of the corporation, using the same books, the same office space and furniture, and the same personnel. At the time of dissolution of the corporation, its book net worth was $3,466.91, which sum was set up on the partnership ledger under the heading "W. H. Wilson & Co. - Investment in partnership." The office building was not reflected in said book net worth. Some of the clerks and other personnel of W. H. Wilson Co. operated the Warehouse Company. The bookkeeper of W. H. Wilson Co. also kept the books of the Warehouse Company. For these services W. H. Wilson Co. received payments of $650approximately a month from the Warehouse Company. Partnership returns of income have been filed for W. H. Wilson Co. beginning with the fiscal year ended June 30, 1936, and continuing through the *144 years in question. The returns for the fiscal years ended in 1936 and 1937 listed as partners petitioner and Mrs. Wilson, each with a 50 per cent interest in the business. S. E. Adams and W. H. Wallace had been employed by the corporation, W. H. Wilson, Inc., up until the time of its liquidation in 1935. During 1932 and 1933 the corporation was in financial difficulties and unable to pay salaries due to Adams and Wallace. At the time of liquidation there were sums owing to these employees on the books of the corporation, and they were then promised interests as partners in W. H. Wilson Co. They continued to work for W. H. Wilson Co., but it was not until July 1, 1937, that they were brought into the business as partners. On that date entries were made on the books recording for Adams and Wallace an interest in the company, $1,000 each. No money was paid in by either at that time. The interests so given were in consideration of back salary and bonus owing to them. On June 30, 1938, an entry was made to record their $2,000 investment in the account entitled "W. H. Wilson & Co. - Investment in partnership." The partnership returns for the fiscal years ended in 1938 and 1939 listed the *145 partners as petitioner and Mrs. Wilson, each having a 40 per cent interest, and Adams and Wallace, each having a 10 per cent interest. Both Adams and Wallace at all times recognized Mrs. Wilson as a coowner of the business. Marjorie Anne Wilson (now Mrs. Langdon S. Ligon, Jr.) is the daughter and only child of petitioner and Mrs. Wilson. On her 17th birthday, August 13, 1939, her mother and father each handed her a signed paper reciting the gift to her of a 10 per cent partnership interest, but the papers have been misplaced or lost. Some time prior to July 1939, petitioner and Mrs. Wilson discussed with Adams and Wallace the matter of bringing Marjorie Anne into the business as a partner. Adams and Wallace understood that Marjorie Anne was to participate in the profits but they did not expect her to take any part in the management of the business. On the occasion of Marjorie Anne's 18th birthday Mrs. Wilson informed her that she was to have an additional 5 per cent interest in the business. Petitioner, Adams, Wallace, and three employees, one a bookkeeper, were actively engaged in the business of W. H. Wilson Co. Mrs. Wilson and Marjorie Anne, neither of whom had experience in *146 the grading and selling of cotton, performed no services for the partnership and took no active part in the management and operation of the business. Checks drawn on the partnership bank account were signed by the bookkeeper and were required to be countersigned by petitioner, Adams, or Wallace. There are no individual capital accounts on the books of the partnership, but a single investment account is carried for all. Net profits for each year are credited to an account entitled "Surplus." Petitioner, Mrs. Wilson, Marjorie Anne, Adams, and Wallace have personal or drawing accounts. Distributions are made only at two or three year intervals and involve a charge to surplus and credits to the drawing accounts. One such distribution was made on June 30, 1941, in the amount of approximately $82,000. At the same time approximately $142,000 was transferred from the surplus account to the investment account to bring the balance in the latter up to $150,000. The partnership return for the fiscal year ended June 30, 1940, lists as partners petitioner and Mrs. Wilson, each with a 30 per cent distributive share of the profits, Marjorie Anne, with a 20 per cent share, and Adams and Wallace, *147 each with a 10 per cent share. The partnership return for the fiscal year ended June 30, 1941, states that the partners were petitioner, with a 30 per cent interest, Mrs. Wilson and Marjorie Anne, with 25 per cent each, and Adams and Wallace, with 10 per cent each. There has never been any written partnership agreement between petitioner and Mrs. Wilson or between them and Adams and Wallace. Mrs. Wilson had a drawing account on the books when the business was conducted by the old corporation, W. H. Wilson, Inc., and she has a similar account on the partnership books. The first entry in an account on the books for Marjorie Anne was a credit of $20,607.85 from the "distribution of profits" on June 30, 1941. Shortly thereafter Marjorie Anne's funds were transferred to petitioner's personal account, and petitioner informed her he was holding the funds in trust and administering them for her because she was a minor. Thereafter, petitioner made a number of investments and expenditures for his daughter, among them a $15,000 single premium life insurance policy purchased in her name, 34 shares of stock in the Warehouse Company (part of the 85 shares then held by the partnership as an asset), *148 a certificate therefor being issued in Marjorie Anne's name on July 1, 1942, an automobile, a fur coat, and from $1,800 to $2,000 on her college education. Mrs. Wilson and Marjorie Anne both draw on the business for their personal expenses. With some of her drawings Mrs. Wilson bought two rings and a mink coat. She also paid off a mortgage on her house and one on a house which she gave to her daughter. In addition to her purely personal expenses, Mrs. Wilson uses some of her funds to provide "extras" for the home, for servants, etc. Petitioner gives her no allowance, but he pays the ordinary household expenses. The following table shows the amounts of gross profits from commissions, from trading in cotton, and the net income of the W. H. Wilson Co. partnership, as reported in the partnership returns for the years indicated: Fiscal
Year
Commis-
Trading
Net
Ended
sions
in Cotton
Income
6/30/36
$25,622.55
$ 213.75
$ 6,927.20
6/30/37
36,091.11
7,183.16
23,669.01
6/30/39
27,648.47
4,672.65
14,048.85
6/30/40
41,346.50
16,305.01
37,701.27
6/30/41
51,255.75
90,485.15
118,009.74
The partnership also had some small items of income from *149 dividends, from the Warehouse Company, and from certain miscellaneous sources, as well as occasional gains and losses on stock transactions. In 1939, gross sales of cotton amounted to $61,121.19, and cost of goods sold was $56,448.54; in 1940 the figures were $206,280.03 and $189,975.02; and in 1941 they were $208,688.47 and $118,203.32. In 1940 and 1941 Mrs. Wilson was a bona fide partner engaged in carrying on business in partnership with petitioner, Adams, and Wallace. In 1940 and 1941 Marjorie Anne Wilson was not a bona fide partner in W. H. Wilson Co. The interests of the partners in those years were as follows: Petitioner
40%
Mrs. Wilson
40%
S. E. Adams
10%
W. H. Wallace
10%
Opinion The issue is whether respondent erred in taxing petitioner on 80 per cent of the net income of W. H. Wilson Co. in 1940 and 1941, including the shares reported as belonging to his wife and daughter - in other words, whether Mrs. Wilson and Marjorie Anne, for Federal income tax purposes, were bona fide partners in W. H. Wilson Co. during those years. In Commissioner v. Tower, 327 U.S. 280 (Feb. 25, 1946), the Supreme Court said: There can be no question *150 that a wife and a husband may, under certain circumstances, become partners for tax, as for other, purposes. If she either invests capital originating with her or substantially contributes to the control and management of the business, or otherwise performs vital additional services, or does all of these things she may be a partner as contemplated by 26 U.S.C. §§ 181, 182. * * * [Italics supplied.] And again in the same case the Court said: A partnership is generally said to be created when persons join together their money, goods, labor or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses. When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses of both. * * * Under those principles as applied to the instant case, we think that Mrs. Wilson was a bona fide partner, and that at least from the time of the dissolution of the corporation she and petitioner "really and truly intended to *151 join together for the purpose of carrying on business and sharing in the profits or losses or both." Mrs. Wilson's interest and participation in the business dates back 18 years to the formation of the corporation. It is true that she has not rendered vital services and has not taken an active part in the management of the business, but that is not the only medium through which a wife may become a partner with her husband. When W. H. Wilson, Inc., was organized in 1928, she contriubted capital originating with her, to the extent of about $12,500. Indeed, it appears from this record that she furnished substantially all the capital needed to finance the corporation. Of the outstanding stock of 186 shares, she held 176 and petitioner held about 10. Through her stock ownership she participated in the profits and losses of the business. It is true that the operations of the corporation were apparently not too successful, and that by the time of its dissolution Mrs. Wilson's investment had been reduced to some extent by losses. Nevertheless, when the corporation was dissolved, she did not withdraw from the business her share of the remaining assets. On the contrary, the W. H. Wilson Co. *152 partnership took over those assets and continued to conduct the business, using the same books, the same office space and office furniture, and the same personnel. To us it seems undeniable that the greater part of the equitable interest in the assets was Mrs. Wilson's. And, while the capital with which the partnership began was not large, it cannot be gainsaid that capital has played its part in the production of partnership income. From the first year of its operations the partnership has employed capital in trading in cotton on its own account, and income from that source has steadily grown as accumulated earnings left in the business increased the capital available for merchandising cotton. This case, therefore, unlike the Tower case, supra, is not one where a husband, immediately prior to the dissolution of a corporation, transferred stock to his wife on condition that she place the corporate assets represented by the stock into a new partnership. Nor can it be said that, as in Lusthaus v. Commissioner, 327 U.S. 293 (Feb. 25, 1946), the instant partnership was formed at a time when the prospect of large profits and correspondingly large income taxes caused the husband *153 "to cast about" for a means of lessening the tax. On the other hand, this is a case where the respondent, having apparently acquiesced for a number of years in the treatment of Mrs. Wilson as a partner, did not challenge her status until a year when profits were large and surtax rates high. Here the petitioner and his wife had been associated together in a business venture since 1928, he furnishing the services and she furnishing most of the capital. That venture, which began as a corporation, has continued without interruption despite the dissolution of the corporation and the subsequent conduct of the business in partnership form. One of the other partners, Adams, testified that before the corporation was dissolved it was contemplated that a partnership would be formed to continue the business, and that he and Wallace were promised an interest in the partnership in consideration of sums owing to them by the corporation for salary and bonuses. Even before the interests were transferred to them, Adams and Wallace recognized Mrs. Wilson as a co-owner of the business with petitioner and considered her as a partner. The first partnership return of income filed by W. H. Wilson Co. for *154 the fiscal year ended June 30, 1936, showed Mrs. Wilson as a partner having an equal interest with her husband. In all these circumstances, we think it clear that Mrs. Wilson was a partner in the firm. As for Marjorie Anne, however, it is clear that she has contributed neither services nor capital originating with her. She therefore fails to meet the requirements mentioned in the Tower and Lusthaus cases. We accordingly hold that for Federal income tax purposes the attempt to make her a partner was ineffectual, and the interests of the respective partners in W. H. Wilson Co. remained as before, i.e., petitioner and Mrs. Wilson each having a 40 per cent interest, and Adams and Wallace each having a 10 per cent interest. It follows that respondent erred in taxing to petitioner all the partnership income except Adams' and Wallace's shares. The distributive share of partnership income on which petitioner is properly taxable consists of his salary, plus 40 per cent of the net income of the partnership determined after deduction of partners' salaries, in accordance with the customary practice of the partnership. Issues 2 to 4 Findings of Fact During 1940 petitioner received rental *155 income of $360 from real property located in College Park, Georgia, and $80 from property located in Bainbridge, Georgia. He paid $218 taxes, $60 interest, and $50 repairs on both properties. In his return he reported only the income from the Bainbridge property and claimed depreciation in the amount of $293.11, deducting a net loss of $315.11. Respondent allowed the taxes, interest, and repairs expenses in full, but allowed only $75 depreciation. The Bainbridge property, consisting of a house and lot, was inherited by petitioner from his mother in 1916. The house is of frame construction, having about eight rooms. Petitioner installed a new metal roof on the house, at a cost of $577, shortly after acquiring the property. At some time, not definitely disclosed by the record, petitioner leased the premises to the Pure Oil Company, and that company, also at some undisclosed time, demolished the house for the purpose of erecting a filling station. In earlier years petitioner claimed no depreciation on this property in his income tax returns. In his return for 1939, as in the return for 1940, he claimed depreciation of $293.11. The College Park property consists of a lot improved by *156 a frame house with composition roof. Petitioner has never taken depreciation on this property in his tax returns. The house was formerly owned and occupied by petitioner's brother-in-law, S. L. Brooks. It was covered by a first mortgage to the Atlantic Life Insurance Company, and on October 17, 1927, petitioner made a loan of $1,800 to Brooks, taking a second mortgage on the property. Petitioner made some payments on the first mortgage. In August 1937, W. H. Wilson Co. paid off to the Atlantic Life Insurance Company the balance of the first mortgage in the amount of $2,694.14 and entered the property at that figure in its building account. Brooks decided that he could not keep up the mortgage on the property and accordingly on November 13, 1937, he gave petitioner a warranty deed to the property, and petitioner canceled the second mortgage. Brooks thereafter moved out, and beginning some time in 1938, petitioner rented the property to one Payne. On June 1, 1941, entries were made on the books of the partnership transferring the property from the building account to petitioner's personal account, the charge to petitioner's account being $2,694.14, the amount which the company had paid *157 in settlement of the first mortgage with the Insurance Company. Altogether petitioner was out-of-pocket $5,904.14, exclusive of interest, in acquiring the property. On July 8, 1941, petitioner sold the property to Payne for $2,904.47. Opinion The second issue concerns the net amount of income realized by petitioner in 1940 from certain rental property located in Georgia and involves the question of how much depreciation is allowable on the property. The amounts of rent received and the expenditures for taxes, interest, and repairs are not in dispute. Petitioner reported only the rent of $80 received from the Bainbridge property and, in addition to other expenses, claimed a depreciation deduction on that property in the amount of $293.11, deducting a net loss of $315.11. Petitioner admits that he also received $360 rent from the College Park property, which respondent included in his income. Respondent allowed only $75 depreciation for both properties and determined that petitioner realized a net rental income of $37. In addition, he disallowed the loss and restored the amount thereof to income, making a total upward adjustment of $352.11. The basis upon which the respondent determined *158 the amount of depreciation allowable is not disclosed, but his determination that $75 was proper is presumptively correct. Petitioner's evidence fails altogether to establish the probable useful life of the buildings and is insufficient to enable us to determine petitioner's basis for depreciation. In these circumstances, we are not warranted in disturbing respondent's determination as to the amount of depreciation allowable on the rental property. The third issue is whether petitioner is entitled to a loss deduction in 1941 on account of the demolition of the Bainbridge building. The house was torn down by the Pure Oil Company, to which petitioner had leased the property for 25 years, in order to erect a filling station. Petitioner could not remember when the house was demolished. He testified, "I imagine back there around 1940 or somewhere along there." The witness whom he called to testify as to the value of the property, a resident of Bainbridge, testified that the building was torn down "about 1939 - 1939 or thereabouts." For ought that we know, therefore, the house may have been demolished in a year prior to the year for which the loss is claimed. On brief petitioner argues *159 that 1941 must be the year in which the event occurred, because he received rental income from the property in 1940. But we do not think that circumstance fixes the date of demolition of the house, for we do not know when petitioner leased the property to the Pure Oil Company. Furthermore, for reasons already stated, we have no way of determining from the evidence what was petitioner's basis for gain or loss on the Bainbridge property, and the unexhausted basis of the building is the measure of the loss from demolition. William Heyman, 6 T.C. 799. Accordingly, on this issue respondent is sustained. The fourth issue is whether petitioner is entitled to a loss deduction in 1941, on account of the sale of the College Park property. The evidence shows only that petitioner was out-of-pocket $5,904.14 in acquiring the property, that he acquired it November 13, 1937, that he sold it July 8, 1941, for $2,904.47, and that the house was of frame construction with a composition roof. As already stated, there is no evidence as to the probable useful life of the building. We do not know what adjustments should be made for depreciation allowed or allowable. There is likewise no evidence *160 as to the relative values of the house and of the lot. Loss, if any, on the house could be an ordinary loss, and loss on the land would be a capital loss subject to the limitations of section 117, Internal Revenue Code. Quincy A. Shaw McKean, 6 T.C. 757; N. Stuart Campbell, 5 T.C. 272. It is also questionable whether petitioner's total cost is the proper measure of his unadjusted basis, in view of the circumstances under which he acquired the property from Brooks. See Commissioner v. Spreckels, 120 Fed. (2d) 517; I.T. 3548, 1942-1 Cum. Bull. 74. Accordingly, on this issue respondent is sustained. Issue 5 Findings of Fact In 1927 and 1928, petitioner had certain transactions in stocks, cotton, and grain through the brokerage firm of E. F. Hutton & Co., New York City, which resulted in losses. The brokers had over-extended credit to petitioner and on August 30, 1928, he was indebted to them on account of such transactions in the amount of $2,116.19. That amount, together with subsequently accrued interest, was reduced through subsequent payments by petitioner up until 1936. At that time Hutton & Co. agreed not to press petitioner *161 for the balance and he promised to pay them when he could. In 1941 petitioner paid them the balance of $1,498.08. No interest was charged petitioner after 1936. Prior to 1936 petitioner had similar transactions through the brokerage firm of Wachaman & Wassell, which likewise resulted in losses. In 1936 he gave the brokers a note for $1,000 to cover the losses and paid the note in 1941. In his return for 1941 petitioner claimed a deduction in the amount of $2,498.08, the total of the sums paid to Hutton & Co. and Wachaman & Wassel in that year. Respondent disallowed the deduction. Petitioner files his income tax returns on the basis of cash receipts and disbursements. Opinion In support of his claim for a loss deduction in the amount of the sums paid to the two brokerage firms in 1941, petitioner relies on the rule of such cases as Eckert v. Burnet, 283 U.S. 140, and Max Gross, 36 B.T.A. 759, that a cash basis taxpayer sustains no deductible loss until he has made an outlay of cash or property, and that the mere giving of a note will not support a loss deduction in the year in which the note is given. There has been some dispute as to whether petitioner *162 was on the cash basis, but he testified that he files his returns on that basis. Three of his individual returns are in evidence. The 1939 and 1940 returns state that they were prepared on the cash basis. The 1941 return states that it was prepared on an accrual basis, but we note that in the deficiency notice relating to that year respondent disallowed an item of accrued state taxes, with the following explanation: Since your income is reported on the basis of cash receipts and disbursements only the State income taxes actually paid during the year may be deducted. The excessive deduction of $1,067.72 has, accordingly, been disallowed and restored to income for the year 1941. We think that petitioner's counsel, in making the off-hand statement at the hearing that petitioner's returns were filed on an accrual basis, apparently had in mind the partnership returns. Several of the latter are in evidence and indicate that they were prepared on an accrual basis. Under the circumstances, we have concluded and found as a fact that petitioner files his individual returns on the cash basis. The facts relating to this issue are in all material respects the same as they were in the case *163 of Page v. Rhode Island Hospital Trust Co., 88 Fed. (2d) 192, in which a cash basis taxpayer was allowed to deduct payments to his broker in 1928 to cover losses on transactions in earlier years through an under margained account. It follows that respondent erred, and that petitioner is entitled to the claimed deduction for 1941. Issue 6 Findings of Fact In 1941 petitioner, in addition to his other activities, was engaged in the poultry business. In his return for that year he deducted $5,107.51 as a loss sustained in the operation of his poultry farm. Included in the loss was a depreciation item of $1,675, which respondent reduced to $915.47. In January 1941, petitioner acquired nine poultry houses at a cost of $19,200, nests and thoughs, etc., at a cost of $2,500, and in June 1941, an incubator and hatcher at a cost of $2,684.10. Respondent allowed depreciation on the poultry houses at the rate of three per cent, on the incubator and hatcher at the rate of 6 2/3 per cent, and on the nests and troughs at the rate of ten per cent. Petitioner's nine poultry buildings are "ordinary hen houses" of frame construction with tar paper roof, open in front and back, and *164 exposed to the weather. The openings are covered with wire mesh. Petitioner employs tenant labor on his poultry farm, and the tenants do not take very good care of the equipment. The useful life of the poultry houses is no more than ten years and the useful life of the incubator and hatcher is five years. Opinion On the sixth issue we think petitioner has demonstrated satisfactorily that respondent's allowance for depreciation on the poultry farm equipment was inadequate. Nine poultry houses were acquired by petitioner in January 1941, at a cost of $19,200. Respondent allowed depreciation of only three per cent, that is, on a basis of a useful life of 33 1/3 years. Petitioner testified that such a building would last about ten years of the average. The poultry houses were of frame construction with tar paper roof - just "ordinary hen houses" - open and exposed to the weather. From all the evidence, we conclude, and have found as a fact, that the useful life of the poultry houses was no more than ten years. Depreciation should therefore be recomputed at the rate of ten per cent on the cost of $19,200. We have also found that the useful life of the incubator and hatcher was five *165 years and not fifteen years, as determined by respondent. In so determining we have considered the fact that petitioner had had a long experience of about 25 years in the poultry business, that he was familiar with the equipment, that the tenants he employed did not take very good care of the equipment, and his testimony that under such circumstances five years was the average useful life of an incubator and hatcher. This item was acquired in June 1941, and depreciation thereon should be recomputed at the rate of 20 per cent for the six months' period on the cost of $2,684.10. Petitioner took depreciation on the nests, troughs, etc., acquired at a cost of $2,500, at the rate of ten per cent, and respondent allowed the amount claimed. That item therefore is not contested. Issue 7 Findings of Fact In 1941 petitioner owned a Chevrolet automobile which he used at least 50 per cent of the time for business purposes in connection with the cotton business and the poultry farm. Eighty dollars is a reasonable allowance for depreciation applicable to the business use of the automobile. Opinion The seventh issue, concerning depreciation on petitioner's automobile used partly for business *166 and partly for pleasure, is disposed of by our finding that $80 is a reasonable allowance for depreciation applicable to the business use of the automobile. Issue 8 Findings of Fact In 1940 and 1941 petitioner received a salary of $7,200 from W. H. Wilson Co. Adams and Wallace also received salaries. The salaries of all three were first deducted in determining the partnership net income and the distributive shares of the partners reported in the partnership returns. Twenty per cent of petitioner's distributive share of partnership profits is reasonable compensation for his services and constitutes his earned income Opinion The eighth issue involves the petitioner's earned income credit for each of the taxable years. Section 185 of the Code, as applicable to those years, provides for the determination of that part of a partner's share of partnership income which consists of earned income, in accordance with regulations prescribed by the Commissioner. Section 19.185-1 of Regulations 103 provides that in such cases the earned income shall not exceed a reasonable allowance as compensation for personal services actually rendered by the partner in connection with the partnership *167 business; and in a trade or business where both capital and personal services are income-producing factors, the maximum limit of reasonable compensation is 20 per cent of the partner's distributive share of the net profits of the partnership. Both capital and services were income-producing factors in the business of W. H. Wilson Co., and, we conclude that 20 per cent of petitioner's share of the partnership net profits is a proper measure of a reasonable allowance as compensation for personal services actually rendered. In the recomputation, petitioner's earned income credit should be determined on that basis. Issue 9 Findings of Fact When the corporation, W. H. Wilson, Inc., was in existence, it built an office building on land leased by the Warehouse Company from the Piedmont and Northern Railroad. After the corporation was dissolved, W. H. Wilson Co. took over and occupied the building as its office space, carrying it on the partnership books as an asset. Two or three years later W. H. Wilson Co. bought from the railroad company the land on which the building stood. The building is two stories high. The upper story is divided into classing rooms and storage rooms for samples *168 of cotton, and the downstairs consists of three rooms used for offices. Opinion The final issue is whether the partnership, W. H. Wilson Co., is entitled to depreciation on its office building (as affecting petitioner's distributive share of the partnership net profits) in the amount of $65.53 now claimed by petitioner for each of the years. The partnership took over the building from the predecessor corporation. However, no depreciation was claimed thereon in the partnership returns for the fiscal years ended in 1940 and 1941, and no evidence has been offered as to the cost or other basis of the building to the partnership, or as to the useful life or the rate at which it is depreciating. For lack of such evidence, we are unable to sustain petitioner on this issue. Decision will be entered under Rule 50.